

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

FILED

DEC 8 2006

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY CLERK

| | |
|---|---|
| JOSE C. DEHOYOS, et al | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. SA-01-CA-1010-FB |
| | ) |
| ALLSTATE INSURANCE COMPANY, et al | ) |
| | ) |
| Defendant. | ) |

---

## DEFENDANT'S BRIEF IN SUPPORT OF PROPOSED CLASS SETTLEMENT

---

Kevin Sadler
Baker Botts LLP
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
512.322.2500(tel)

Tony P. Rosenstein
Baker Botts L.L.P.
One Shell Plaza
910 Louisiana
Houston, Texas 77002
(713) 229-1582 (tel)

Jeffrey Lennard
M. Keith Moskowitz
Sonnenschein Nath & Rosenthal LLP
7800 Sears Tower
Chicago, Illinois 60606
(312) 876-8000 (tel)

Richard C. Godfrey, P.C.
Donna M. Welch
Kirkland & Ellis
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000 (tel)

*Attorneys for The Allstate Corporation, Allstate Insurance Company, Allstate*



## TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................1

THE SETTLEMENT RELIEF ......................................................................................2

    1.   Opportunity To Obtain An Allstate Policy Priced Using The Settlement Algorithm..................................................................................................2

    2.   Settlement Payments To Certain Class Members....................................3

    3.   Appeals Process .....................................................................................4

    4.   Targeted Consumer Credit Education.....................................................4

    5.   Publication Of The Settlement Algorithm ..............................................5

    6.   Allstate Spending On Multicultural Marketing .......................................5

ARGUMENT ................................................................................................................5

    I.   The Class Action Settlement Should Be Approved As Fair, Reasonable And Adequate. ....................................................................................5

        A.   The Settlement is Presumptively Fair. ...........................................6

        B.   The Settlement Provides Fair Value Compared To Significant Weaknesses In Plaintiffs' Claims. .............................................7

            1.   Both Factual And Legal Obstacles Exist That Significantly Decrease The Likelihood Of Plaintiffs' Success On The Merits. .............................................................................7

            2.   The Benefits Of Settlement To Plaintiffs Outweigh The Risks Of Litigation....................................................................14

        C.   Additional Factors Likewise Support Approval Of The Settlement..........15

            3.   The Complexity, Expense, And Likely Duration Of The Litigation Weigh In Favor Of Approving The Settlement.............15

            4.   The State Of The Proceedings And The Amount Of Discovery Completed Have Provided The Information Necessary To Make An Informed Judgment On The Merits Of The Settlement. ................................................................16

            5.   The Opinions Of Class Counsel Support Approval Of The Settlement Agreement................................................................17

i



II.     The Few Objections That Have Been Raised Are Without Merit. ........................18

    A.     Certification Of A Rule 23(b)(2) No Opt-Out Class And The Court
       Approved Notice Were Appropriate. ........................................................20

    B.     The Settlement Provides Significant Equitable Relief Not
       Otherwise Available To Class Members. ...................................................26

       1.     The Settlement Algorithm Was The Product Of Settlement
          Negotiations And Does Not Constitute "Illusory Relief." .............26

       2.     The Credit Education Program Provides A Tangible
          Benefit To The Class. ...................................................................28

       3.     Allstate Has Agreed To Implement A Valuable Nationwide
          Appeals Process. ..........................................................................29

       4.     Allstate's Agreement To Commit Substantial Sums To
          Minority Marketing Benefits The Class. ........................................31

    C.     The Monetary Payments Are Reasonable And Provide Value To
       The Class. ...............................................................................................32

    D.     The Preliminary Injunction In The Settlement Agreement Does
       Not Violate The Anti-Injunction Act. ......................................................33

    E.     The Release Is Not Impermissibly Overbroad. .........................................34

       1.     The *Melder* Louisiana State Law Claims Lack Merit And
          The *Melder* Claims Can Appropriately Be Released. ....................35

    F.     The Remaining Objections Are Likewise Without Merit And
       Should Not Affect Approval Of The Settlement As Fair, Adequate
       And Reasonable. .....................................................................................38

       1.     The Request Forms Are A Necessary Predicate To
          Facilitating Certain Settlement Relief. ..........................................38

       2.     There Are No Intra-Class Conflicts That Would Serve To
          Disqualify The Class Representatives. ...........................................39

       3.     The Settlement Does Not Intentionally Chill Objections. .............41

       4.     A *cy pres* Award Is Not Appropriate. ...........................................41

CONCLUSION ....................................................................................................42

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| JOSE C. DEHOYOS, et al | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. SA-01-CA-1010-FB |
| v. | ) |
| | ) |
| ALLSTATE INSURANCE COMPANY, et al | ) |
| | ) |
| Defendant. | ) |

---

### DEFENDANT'S BRIEF IN SUPPORT OF PROPOSED CLASS SETTLEMENT

---

### INTRODUCTION

On March 24, 2006, Plaintiffs submitted a brief in support of preliminary approval of the proposed settlement. Finding that the proposed settlement appeared to be fair and reasonable, on June 2, 2006, the Court issued an order granting Plaintiffs' Motion for Preliminary Approval, certified the class for settlement purposes only, and authorized the parties to disseminate notice.

As the dearth of objections highlights, the negotiated settlement is fair, adequate, and reasonable and fully merits final approval. The settlement will provide Class members with significant equitable relief, as well as allow Class members to apply for monetary relief provided by the settlement. The settlement was reached following more than a year of intense arms length settlement negotiations between the parties, of which the parties kept the Court informed through regular status reports. Plaintiffs' Counsel have concluded that the settlement is an excellent result and is in the best interests of the Class.

As this Court is well aware, public policy strongly favors settlements. *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). Further, "[o]nce preliminary approval [to a class action

settlement] has been granted, a settlement is presumptively reasonable and an objector must overcome a heavy burden to prove that the settlement is unreasonable." *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 246 (S.D. Ohio 1991). Where, as here, sophisticated Plaintiffs' Counsel fully support the settlement and objections are both few and not well-founded, final approval is warranted.

### THE SETTLEMENT RELIEF

Plaintiffs and Allstate engaged in lengthy and contentious negotiations ultimately resulting in a settlement agreement that Plaintiffs maintain, and Allstate agrees, is a fair, reasonable and adequate resolution of this litigation. (Settlement Agreement, at 2-3.) Plaintiffs also contend that this settlement agreement is in the best interests of the alleged class. (*Id.*) The Settlement Agreement defines the "class members" to include individuals who are Black and/or African American or of Hispanic or Latino origin and who were charged a premium for a policy that was anything but the lowest available based in whole or in part on credit report information or who did not qualify for a policy issued by an Allstate insurer based in whole or in part on credit report information, but who were issued a policy by another Allstate insurer. (*Id.* at ¶2.C.) Class members are entitled to the following substantial and extensive consideration and benefits through the Settlement Agreement.

### 1.     Opportunity To Obtain An Allstate Policy Priced Using The Settlement Algorithm

Plaintiffs' core allegation is that Allstate's insurance scoring algorithm results in Class members being charged racially discriminatory premiums in violation of the Federal Civil Rights laws. (Settlement Agreement at 2.) Pursuant to the Settlement Agreement, Allstate has agreed to implement and maintain for an agreed upon period of time a new insurance scoring algorithm ("Settlement Algorithm") that Plaintiffs contend addresses this central challenge to Allstate's

practices. (*Id.* at ¶3.) All Class members who are currently insured under Allstate automobile and homeowners policies will have the opportunity to obtain a policy that is priced using the Settlement Algorithm. (*Id.*) [1] Class members who are no longer insured by Allstate will also have the opportunity to obtain an Allstate policy priced using the settlement algorithm if they apply for Allstate insurance in the future. (*Id.*)

## 2.      Settlement Payments To Certain Class Members

Class members who submit request forms may also be entitled to a one-time settlement payment from Allstate. (Settlement Agreement, ¶3.C.) Monetary payments will be determined by comparing the Insurance Scoring Group or Credit Classification (rating variables derived from a policyholder's credit report information pursuant to Allstate's rating plans) assigned to the Class member's policy with an Insurance Scoring Group or Credit Classification assigned under the Settlement Algorithm using the Class member's current credit report information. (*Id.* at ¶3.C.3.) Monetary payments will be made to Class Members whose Insurance Scoring Group or Credit Classification improves under the Settlement Algorithm. (*Id* at ¶3.C.4.) These monetary payments range from $50 to $150 depending on the amount of improvement of a Class member's Insurance Scoring Group and the number of policy periods that a Class member's policy was or has been priced using credit report information. (Settlement Agreement, Ex. 10.)

---

[1]     Current class members who submit request forms will also receive important information about how they will have the opportunity to obtain a policy priced using the Settlement Algorithm. (*Id.*)

**3.      Appeals Process**

Allstate will implement a nationwide appeals process through which its policyholders, including Class members, with lower than neutral credit report information when evaluated under Allstate's applicable rating plan will be able to pursue an appeal of Allstate's use of their credit information based on nine extraordinary circumstances. (Settlement Agreement, ¶3.D.) These extraordinary circumstances are: (1) divorce; (2) death of spouse or member of the same household; (3) involuntary unemployment; (4) catastrophic medical expense; (5) care of an adult dependent; (6) identity theft; (7) long term injury, illness or disability; (8) domestic violence; and (9) additional state specific events as required by law.  (Settlement Agreement, Ex. 11.)  Class members who successfully appeal will receive premium reductions.  (*Id*. at Ex. 11.)  Allstate will notify all eligible policyholders of this appeals process and will provide a toll-free number to policyholders for making inquiries about the appeals process. (*Id*. at ¶3.D.3.)

**4.      Targeted Consumer Credit Education**

In addition, Allstate has agreed to pay for a comprehensive credit education program targeted to the African American and Hispanic communities. (Settlement Agreement, ¶3.E.1.) This credit education program will be developed and implemented by National Council of La Raza ("NCLR"), the largest Hispanic civil rights and advocacy organization, and the National Urban League, the nation's oldest and largest community based African American advocacy organization.  Both NCLR and National Urban League will develop comprehensive educational programs specifically tailored to their respective constituencies.  (See, *infra*, Section, II.B.2.)

5.      **Publication Of The Settlement Algorithm**

Allstate has agreed to make the Settlement Algorithm, including the specific weights and variables that comprise this algorithm and other information about its use of credit report information, available to the public. (Settlement Agreement, ¶3.B.1.) Allstate has posted the Settlement Algorithm on the Settlement Administrator's website where it will remain available through February 18, 2007. (*Id.*)  A description of the Settlement Algorithm, consistent with the description in Exhibit 8 of the Settlement Agreement, is posted on both Allstate's website and the Settlement Administrator's website. (*Id.*)  Furthermore, any Class member who does not have access to Allstate's or the Settlement Administrator's respective websites can request a copy of the Settlement Algorithm by mail. (*Id.*) Finally, where required, Allstate will publicly file the Settlement Algorithm with relevant state regulatory agencies. (Id. at ¶3.B.2.)

6.      **Allstate Spending On Multicultural Marketing**

Allstate has also agreed to spend, at a minimum, for its fiscal years 2005, 2006, 2007 and 2008, an aggregate average of 15% (over these four fiscal years) of its total national media spend on multicultural marketing. (Settlement Agreement, ¶3.E.)  Multicultural marketing is defined as marketing directed toward African American and/or Hispanic consumers through national media programming. (*Id.*)

**ARGUMENT**

I.      **The Class Action Settlement Should Be Approved As Fair, Reasonable And Adequate.**

Federal Rule of Civil Procedure 23 governs the settlement of class actions. *Pearson v. Ecological Science Corp.*, 522 F.2d 171, 176-77 (5th Cir.1975).  Before a court approves a

5

settlement, the court must find that the proposed settlement is "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(1)(C). *See also Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).  In order to make such a determination, the Fifth Circuit has identified six factors that the Court should consider: (1) the existence of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the factual and legal obstacles to prevailing on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent Class members. *See Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir.1983) (citing *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir.1982)).  The Fifth Circuit has "admonished courts to be mindful of the 'overriding public interest in favor of settlement' in class action suits." *Garza v. Sporting Goods Properties, Inc.*, No. CIV. A. SA-93-CA-108, 1996 WL 56247, at *12 (W.D. Tex. Feb. 6, 1996) (quoting *Cotton*, 559 F.2d at 1331) (attached hereto as Exhibit 1).  In this case, all six factors weigh strongly in favor of approval.

## A.   The Settlement is Presumptively Fair.

This Court has recognized correctly that in considering these six factors, there is a strong presumption in favor of finding the settlement fair. *San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 453 (W.D. Tex. 1999) (citing *Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505, 527 (E.D.Tex. 1995), aff'd, 90 F.3d 963 (5th Cir. 1996)). *See also Cotton*, 559 F.2d at 1331 ("Particularly in class action suits, there is an overriding public interest in favor of settlement.") (citing *United States  v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826 (5th Cir.1975)).  Importantly, courts may presume that a proposed settlement is fair and reasonable when it is the result of arms length negotiations. 4 Newberg on Class Actions § 11:41 (4th ed.).  There is also a presumption that no fraud or collusion occurred between counsel, in the absence of any evidence to the contrary. *Id.* at § 11:51.  Here, as the Court recognized in its

6

preliminary approval order, "the parties engaged in a lengthy, arms' length settlement process. Over the course of 18 months, Plaintiffs and Allstate's counsel held over 50 negotiating sessions." June 2, 2006 Order at ¶ 4.  A presumption of fairness is also warranted in light of the Court's determination that counsel for both parties have "significant experience in litigating and negotiating settlement of class actions" including cases involving allegations of racial discrimination. *Id.*

Therefore, in the absence of fraud or collusion -- which is not even alleged to have occurred here -- the Court can and should presume that the settlement is fair and reasonable. *Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984) ("In the absence of fraud or collusion, the trial court should be hesitant to substitute its own judgment for that of counsel.") (internal quotations and citations omitted).

**B.     The Settlement Provides Fair Value Compared To Significant Weaknesses In Plaintiffs' Claims.**

      **1.     <u>Both Factual And Legal Obstacles Exist That Significantly Decrease The Likelihood Of Plaintiffs' Success On The Merits.</u>**

Once it has been determined that the settlement was the product of arms length negotiations free of fraud or collusion, the next most important factor in determining the fairness, adequacy, and reasonableness of the settlement is the likelihood of Plaintiffs' success on the merits if the case were to proceed to trial. *San Antonio Hispanic Police Officers' Org.*,  188 F.R.D. at 459  (citing *Parker*, 667 F.2d at 1209).  In evaluating the likelihood of success, the court must compare the terms of the settlement with the rewards that the Class would have been likely to receive following a successful trial.  *Reed*, 703 F.2d at 172.

DeHoyos Plaintiffs are residents of Texas and Florida that purport to bring this lawsuit on behalf of a putative nationwide class, claiming they were charged higher insurance premiums for less favorable property and casualty insurance policies in violation of the Civil Rights Acts, 42

U.S.C. §§ 1981 and 1982, and the Fair Housing Act, 42 U.S.C. § 3604. *E.g.* Amended Class Action Complaint (hereinafter "Am. Cmpt.") at ¶¶ 1-12, 16, 71-88.  Specifically, Plaintiffs allege that Allstate intentionally discriminated against the class in the premiums it charged based on its use of credit information in pricing policies. *Id. ¶ 16.* To prevail on their §§1981 and 1982 claims, DeHoyos Plaintiffs would have to prove that Allstate intentionally discriminated against the class in the premiums it charged based on credit information. *See Harris v. Allstate Ins. Co.,* 83 F. Supp. 2d 423, 431 (S.D.N.Y. 2000) (citing *Weiss v. LaSuisse,* 69 F. Supp. 2d 449, 460 (S.D.N.Y. 1999)); *Crawford v. W. Elec. Co.,* 614 F.2d 1300, 1309 (5th Cir. 1980); *See Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 436 (1968).

There are several fundamental problems with Plaintiffs' claims. *First,* Allstate has no idea of the race or ethnicity of its customers and does not track such data. (Declaration Number 1 of William R. Sparks, ¶ 8; attached hereto as Exhibit 2.) *Second,* Allstate's insurance rates are regulated on a state-by-state basis. *See, e.g.,* Tex. Ins. Code §§ 2251.155 (stating that the Insurance Commissioner shall approve a filed rate if it is adequate, not excessive, and not unfairly discriminatory); Fla. Stat. §§ 627.062(2)(b), 627.0651(2) (requiring the Florida Department of Insurance to review all rate filings to determine whether they are excessive, inadequate, or unfairly discriminatory); 215 Ill. Comp. Stat. 5/460 (requiring state insurance Director to disprove of filed rates if they are inadequate, excessive, or unfairly discriminatory); N.Y. Ins. Law §§ 2304-2305 (setting forth standards for rate making and that rates shall be filed for approval with the insurance Superintendent).  In nearly every state, Allstate must file its rates with the department of insurance. *See, e.g.,* Fla. Stat. §§ 627.062(2)(b), 627.0651(2).[2]  And these

---

[2]   Insurers are required to establish rates, rating schedules or rating manuals which allow for a reasonable rate of return, and copies of these rates, rating schedules or rating manuals must be filed with the Department of

(Continued...)

rates filings are typically publicly available.  *See, e.g.,* Tex. Ins. Code § 21.81(d)(1)-(2) (stating that before approving a filing, the commissioner shall provide all interested parties an opportunity to review and obtain copies of the filing); Cal. Ins. Code § 12401.7 (mandating that no company shall use any rate prior to such rate having been made publicly available for a period of no less than 30 days); Mich. Comp. Laws Ann. § 500.2406 ("A filing and any supporting information shall be open to public inspection after the filing becomes effective.").  Allstate's rates are reviewed by state insurance departments to determine if they are excessive, inadequate or unfairly discriminatory and the insurance department has the authority to reject Allstate's rates. *See, e.g.,* Fla. Stat. §§ 627.0651(11), 627.062(2)(h).  Putting aside the fact that Plaintiffs would discover no evidence of intentional discrimination, the pervasive and transparent regulation in every state that Allstate does business in exemplifies the substantial, and Allstate contends insurmountable, obstacles to Plaintiffs prevailing on their §§1981 and 1982 claims.

Any theory of intentional discrimination also flies in the face of the circumstances of this case.  Insurance scoring was developed by a number of companies acting independently; it was based on continuing and recent developments in behavioral research; and it is a practice that has been regulated and expressly approved for use by most states.  *See, e.g.,* TEX. INS. CODE ANN. § 559.151(2005); FLA. STAT. ANN. § 626.97411 (2004).[3]  It is inconceivable -- and not even alleged

---

Insurance. Fla. Stat. § 627.0651(13)(a).  Motor vehicle insurers are subject to an independent and specific requirement to file not only their rates, rating schedules and rating manuals, but also any changes to such rates, rating schedules or rating manuals.  This includes the filing of underwriting rules (if not contained in the insurer's rating manuals). Fla. Stat. § 627.0651(13)(a).

[3]   The following thirty-one additional states have similar statutes or regulations authorizing the use of insurance scoring: Alabama, Alaska, Arkansas, California, Delaware, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Washington and West Virginia.

in this case -- that all of these entities conspired to intentionally discriminate on the basis of race or national origin.

Plaintiffs, however, assert that they can prove their Fair Housing Act claim[4] under a disparate impact theory.[5]  In order to establish a *prima facie* case however, Plaintiffs would be required to demonstrate a substantial disparity in the application of the challenged practice.  If Plaintiffs succeeded in establishing a *prima facie* case, Allstate would then be required to demonstrate that the practice in question is consistent with business necessity.  *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 997-98 (1988).  "Business necessity" is a term of art which connotes a policy or practice that bears a "manifest relationship" to a business purpose or is "significantly correlated" with a business objective.  *Bernard v. Gulf Oil Corp.* 841 F.2d 547, 563 (5th Cir. 1988), citing *inter alia, New York Transit Authority v. Beazer*; 440 U.S. 568, 587, n. 31 (1979) and *Griggs v. Duke Power Co. supra* at 401 U.S. 432.[6]  After making such a showing of business necessity, Plaintiffs would have to show that a lesser disparate alternative existed (*i.e.*, a practice which also accomplishes with equal effectiveness the employer's

---

[4]   Disparate impact claims are not actionable under § 1981 and § 1982.  *See, e.g., Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 111 (1st Cir. 1988) ("Section 1981 reaches only purposeful discrimination.  A plaintiff may not make a disparate impact claim under section 1981."); *Vasquez v. McAllen Bag & Supply Co.*, 660 F.2d 686, 687-88 (5th Cir. 1981) (affirming district court's conclusion that, despite discriminatory impact, § 1981 claimants cannot recover for discriminatory practices unless they are motivated by discriminatory purposes); *Garg v. Albany Indus. Dev. Agency*, 899 F. Supp. 961, 968 (N.D.N.Y. 1995) ("To state a claim under § 1982, the plaintiff must allege with specificity facts sufficient to show or raise a plausible inference of (1) the defendant's racial animus; (2) intentional discrimination....") (citation omitted), *aff'd*, 104 F.3d 351 (2d Cir. 1996).

[5]   The disparate impact theory, first articulated by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) is an attack on a practice that is undertaken without an intent to discriminate but is discriminatory in effect. *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). *See also Senner v. North Central Tech. Coll.*, 113 F.3d 750, 757 (7th Cir. 1997).

[6]    See also *EEOC  v. J. M. Huber Corp.*, 927 F2d 1322, 1328 (5th Cir. 1991) (defining business necessity as showing that a "policy has a significant relationship to a legitimate business purpose").

legitimate interest in efficiency of operation while eliminating the disparate impact) and that the defendant refused to adopt the proposed alternative practice.[7]

Plaintiffs would face substantial challenges in establishing a *prima facie* case. *First,* there is no evidence that insurance scoring results in a disparate impact in terms of the premiums charged to minority policyholders. *Second*, even if Plaintiffs could prove disparate impact, numerous studies have established that insurance scoring is an actuarially sound and powerful predictor of insurance losses. *See, e.g.,* TEX. DEP'T OF INS., USE OF CREDIT INFORMATION BY INSURERS IN TEXAS; THE MULTIVARIATE ANALYSIS (2005) (attached hereto as Exhibit 3); TEX. DEP'T OF INS., USE OF CREDIT INFORMATION BY INSURERS IN TEXAS (2004) (attached hereto as Exhibit 4); A STATISTICAL ANALYSIS OF THE RELATIONSHIP BETWEEN CREDIT HISTORY AND INSURANCE LOSSES; BUREAU OF BUSINESS RESEARCH; MCCOMBS SCHOOL OF BUSINESS; UNIVERSITY OF TEXAS AT AUSTIN (Mar. 2003) (attached hereto as Exhibit 5). Even assuming, *arguendo,* that insurance scoring has a disparate impact, it well settled that it is "significantly correlated" with insurance risk. "Significantly" refers to statistical significance, and current authoritative studies establish that the correlation between credit score and risk of loss is highly statistically significant. (*Id.*). Accordingly, Allstate would be able to prove that insurance scoring is a business necessity.[8]

The burden would then shift back to Plaintiffs to prove that an alternative was available which would have accomplished the same business purpose with equal effect which resulted in

---

[7] *See also* 42 U.S.C. § 2000e-2(k)(1)(A)(ii). The bulk of authority explaining disparate impact claims can be found under Title VII of the Civil Rights Act of 1964, as amended in 1991. *See also Gamble v. City of Escondido,* 104 F.3d 300, 304 (9th Cir. 1997) ("We apply Title VII discrimination analysis in examining Fair Housing Act ("FHA") discrimination claims").

[8] This conclusion is further bolstered by the fact that a majority of insurers currently use insurance scoring to price personal lines insurance policies.

lesser disparate impact.  Plaintiffs would further have to prove that Allstate refused to adopt that alternative.  Taken together, Plaintiffs would face significant obstacles to proving their claims.  The unlikelihood of recovering on a lesser disparate alternative theory is demonstrated by the recent decision in *Adams v. City of Chicago* 2006 WL 3314817 (7th Cir., November 16, 2006) (attached hereto as Exhibit 6).  In that case, the employer effectively stipulated that its promotion test had a disparate impact and that there was an equally effective alternative selection device with a lesser disparate impact.  Judgment as a matter of law for the employer was nevertheless affirmed because there was no proof that the alternative was validated (and therefore truly available) at the time of the decisions at issue, or that the defendant was actually given an opportunity to adopt it.  In the present case, Allstate is aware of no equally effective mechanism to insurance scoring; certainly none was available at the time this case was filed; and *a fortiori,* Allstate has never been presented with any such alternative that it is has refused to adopt.[9]

What is more, certifying such Plaintiffs' proposed class outside of the settlement context would present another substantial challenge. Because the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the class action,  this factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial.  *In re Warfarin Sodium Antitrust Litigation* 391 F.3d 516 (3rd Cir. 2004).  Insurance scoring results in many Allstate policyholders being charged lower premiums than if insurance scoring was not used to determine their premiums. It is inevitable that many minority policyholders are amongst those who benefit from insurance scoring making certification extraordinarily difficult.  *See Pickett v. Iowa Beef Processors,* 209 F.3d 1276, 1280 (11th

---

[9]  "Most critical to this case, the statutory scheme requires plaintiffs to demonstrate a viable alternative and give the employer an opportunity to adopt it."  *Id.* at 3.

Cir.2000) ("[A] class cannot be certified when . . . it consists of members who benefit from the same acts alleged to be harmful to other members of the class.") (*citing Bieneman v. City of Chicago*, 864 F.2d 463 (7th Cir.1988) (denying certification of a class of all landowners in the vicinity of an airport because, while Plaintiffs claimed that the airport decreased the value of their land, other landowners tremendously benefited from the proximity of the airport)); *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189-90 (11th Cir. 2003) (A fundamental conflict, which will extinguish a party's claim to class certification, "exists where some party members claim to have been harmed by the same conduct that benefited other members of the class," and "no circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class") (*citing Auto Ventures, Inc. v. Moran*, 1997-1 Trade Cas. (CCH) ¶ 71,779, 1997 WL 306895 (S.D.Fla.1997) (attached hereto as Exhibit 7) (refusing to certify a class of Toyota dealers because "the class collapses into distinct groups of winners and losers.")). *See also Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 624 (1997) (decertifying class and finding that commonality requirement was not met where some class members suffered no injury while others were harmed to greater degrees)).

In addition, there is an interplay between Plaintiffs' general challenge to Allstate's rates under the Federal Civil Rights laws and the state laws that specifically govern these rates. Given that the laws of numerous states may be relevant to individual class member claims, Plaintiffs would face a further significant challenge to certifying a class outside the settlement context. *See Castano v. American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996) (Decertifying class and stating that "[i]n a multi-state class action, variations in state law may swamp any common issues and defeat predominance" and undermine superiority) (*citing Georgine v. Amchem Prods.,*

83 F.3d 610, 618 (3d Cir.1996) (decertifying class because legal and factual differences in the plaintiffs' claims "when exponentially magnified by choice of law considerations, eclipse any common issues in this case"); *In re American Medical Systems Inc.*, 75 F.3d 1069,1085 (6th Cir. 1996) (granting mandamus in a multi-state products liability action, in part because "[t]he district court ··· failed to consider how the law of negligence differs from jurisdiction to jurisdiction"); *Walsh v. Ford Motor Co.*, 807 F.2d 1000 (D.C.Cir 1986) (stating that a district court must consider how variations in state law affect predominance and superiority)).

### 2.     The Benefits Of Settlement To Plaintiffs Outweigh The Risks Of Litigation.

The proposed settlement will not only provide significant benefits to members of the Plaintiff Class but to minorities throughout the country as well.  As a result, Plaintiffs' Counsel have concluded that the settlement is in the best interests of the Class because of (1) the substantial and immediate benefits provided to the Class members, including implementation of a new credit scoring algorithm; (2) the risks and length of trial in the Class Action; and (3) the likelihood of appeals and subsequent proceedings.

In place of the current insurance scoring algorithm, which Plaintiffs claim has a disparate impact on minority applicants for insurance, Allstate has agreed to roll out the Settlement Algorithm that it will use to underwrite and/or price personal lines insurance policies.  Plaintiffs' Counsel report that their statistical experts have engaged in an extensive disparate impact analysis of policyholder data that was produced by Allstate.  With the assistance of their experts, Plaintiffs' Counsel believe that the roll-out of the Settlement Algorithm will provide material benefit to Class members.  As a part of the roll-out, in certain states, policyholders, including Class members, will automatically be able to obtain a policy with a premium determined using

14

the Settlement Algorithm.  In certain other states, Class members may request the opportunity to have their policy priced using the Settlement Algorithm prior to renewal.

In addition to implementing the Settlement Algorithm, Allstate has agreed to implement an appeals program to allow customers, including Class members, to appeal the use of their insurance scores based on certain defined "extraordinary" circumstances.  Further, Allstate has agreed to fund a credit education program designed by two leading national minority advocacy organizations, to increase minority understanding of the use of credit and techniques for managing their credit histories.  At the request of Plaintiffs, Allstate has also agreed to increase and maintain the percentage of its marketing budget directed to African American and Hispanic/Latino communities.  Finally, in addition to the equitable relief described above, Allstate has agreed to make monetary payments to those Class members who complete a claim form and qualify under a formula that compares the insurance scoring group assigned to his or her Allstate policy in the past, and the insurance scoring group assigned under the Settlement Algorithm.  As Plaintiffs' Counsel have determined, these substantial and immediate benefits from the settlement far outweigh the expected benefits to the Class from uncertain and potentially protracted and costly litigation.

## C.    Additional Factors Likewise Support Approval Of The Settlement.

### 3.    The Complexity, Expense, And Likely Duration Of The Litigation Weigh In Favor Of Approving The Settlement.

In evaluating the merits of a class action settlement, this Court has recognized that it is important to be mindful of "the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *San Antonio Hispanic Police Officers' Org.*, 188 F.R.D. at 458 (citing *In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993)).  Consequently, "[i]t has been

held proper to take the bird in the hand instead of a prospective flock in the bush." *Id.* (internal quotations and citations omitted).  Here, the litigation has proceeded over a period of five years, and included both appeals to the Fifth Circuit Court of Appeals and the United States Supreme Court.[10]   As counsel for the parties have concluded, the probability of further protracted litigation[11], including appeals, would, in absence of the settlement, be a certainty.

> **4.   The State Of The Proceedings And The Amount Of Discovery Completed Have Provided The Information Necessary To Make An Informed Judgment On The Merits Of The Settlement.**

In order to determine whether the parties have sufficient information upon which to evaluate the terms of the settlement, a court should look to more than simply the amount of formal discovery that has been completed.  *Cotton*, 559 F.2d at 1332-33.  The court should consider all information that has been available to the parties. *See Ahearn*, 162 F.R.D. at 528 (noting that a court should look to information including factual and legal issues identified and developed from prior proceedings and litigation).

In this case, as part of negotiations conducted over the course of 18 months, Allstate produced tens of thousands of documents, including rate books and policy manuals.  Allstate also produced voluminous electronic data, including the highly sensitive data used to develop its insurance algorithm.  Plaintiffs retained statistical experts who reportedly engaged in extensive disparate impact analysis of policyholder data and Allstate's insurance scoring algorithm.  In

---

[10]   At the outset of this case Allstate filed a motion to dismiss that was denied by the Court.  The Court's denial was affirmed by a divided opinion of the 5th Circuit Court of Appeals and Allstate's Petition for Writ of Certiorari was subsequently denied by the United States Supreme Court.  This initial motion was litigated for three years and is indicative of the complexity, expense and likely duration of continued litigation.

[11]   This would include: (i) contested class certification proceedings; (ii) an appeal under Rule 23(f); (iii) dispositive motion practice; (iv) expert depositions leading to *Daubert* motions; (v) extensive pretrial filings; (vi) a lengthy trial; (vii) post-trial proceedings in the District Court; and (viii) an actual appeal.  In other words, litigated resolution is many years away and at the end, Allstate believes plaintiffs are unlikely to recover anything at all.

light of this discovery, and Plaintiffs' expert statistical analysis, Plaintiffs' Counsel had more than sufficient information to decide whether the settlement is fair, adequate, and reasonable, and, more importantly, to Plaintiffs' ultimate benefit.

### 5.   The Opinions Of Class Counsel Support Approval Of The Settlement Agreement.

After over a year of arduous negotiations and after careful consideration, Plaintiffs' Counsel have concluded that the settlement is in the best interests of the Class and is an overall excellent result.  It is well settled that the endorsement of Class counsel is entitled to great weight, especially in light of Class counsel's significant experience in complex civil litigation and their lengthy opportunity to evaluate the merits of the claims.  *See Lelsz v. Kavanagh*, 783 F.Supp. 286, 297 (N.D. Tex. 1991), aff'd, 983 F.2d 1061 (5th Cir. 1993); *McNary v. American Sav. and Loan Ass'n*, 76 F.R.D. 644, 648-49 (N.D. Tex. 1977).  Here, counsel for both parties have engaged in numerous class-action lawsuits and possess a substantial amount of experience and expertise.  Indeed, the Court found that "counsel for all [p]arties have significant experience in litigating and negotiating settlements of class actions" and "cases involving allegations of racial discrimination."  June 2, 2006 Order at ¶ 4.  "In reviewing the opinions of counsel, the Court is to bear in mind that counsel for each side possess the unique ability to assess the potential risks and rewards of litigation, and a presumption of correctness is said to attach to a class settlement reached in arms length negotiations between experienced, capable counsel after meaningful discovery." *San Antonio Hispanic Police Officers' Org.*, 188 F.R.D. at 461 (quoting *Lelsz*, 783 F.Supp. at 297 (internal citations omitted). *See also Cotton*, 559 F.2d at 1330

("Compromise is the essence of a settlement," and the court may rely on "the judgment of experienced counsel for the parties.").[12]

## II.     The Few Objections That Have Been Raised Are Without Merit.

In addition to the opinions of Class counsel and Class representatives, the Court should also consider the opinions of absent Class members. Yet, "in doing so, the Court should . . . [keep] in mind [that] the settlement can be fair even if a large number of class members oppose it." *Garza*, 1996 WL 56247, at *19 (citing *Reed*, 703 F.2d at 174); *see also Reed v. Rhodes*, 869 F. Supp. 1274, 1281 (N.D. Ohio 1994); FED. PRAC. & PROC. § 1791.1 ("[T]he fact that there is opposition does not necessitate disapproval of the settlement.). "In assessing the fairness of the proposed compromise, the number of objectors is a factor to be considered but is not controlling." *Cotton*, 559 F.2d at 1331 (citing *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799 (3d Cir. 1974)).

Once the Court is satisfied that the terms of the settlement are fair and adequate, the settlement should be approved by the Court despite objections by certain class members. *See* 3B Moore, MOORE'S FEDERAL PRAC. ¶ 23, 1.24[2] (1987). "A contrary view would put too much power in a wishful thinker or a spite monger to thwart a result that is not in the best interests of the [class]." *Saylor v. Lindsey*, 456 F.2d 896, 899-900 (2d Cir. 1972).

In this case, ten objections have been filed. In light of the likely size of the settlement class and the reach of nationwide notice, *see* Declaration of Jeanne C. Finegan, APR at ¶ 24 (attached hereto as Exhibit 8)(declaring that based on MRI research, publication plan reached

---

12   Furthermore, the recommendation of counsel is entitled to great weight following arm's length settlement negotiations, such as those that occurred here. *Hammon v. Barry*, 752 F. Supp. 1087, 1093 (D.D.C. 1990). A "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arms–length negotiations between experienced, capable counsel after meaningful discovery." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (quoting *Manual For Complex Litigation (Third)* § 30.42 (1995)).

80% of all adults 18 and over, 87.04% of African American target group, 70.35-73.38% of

Hispanic/Latino target group, and 77.65% of non-white target group), the number of objectors is

*de minimus.*  This extremely minimal level of opposition represents overwhelming support by the

Class for the Settlement Agreement.  *See Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d

Cir. 1990) (stating that objections by even 10% of the class "strongly favors settlement");

*DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995) ("The fact that only a

handful of class members objected to the settlement similarly weighs in its favor); *see also Bell*

*Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313-14 (3d Cir. 1993) (Class silence can be considered

consent to the settlement); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974)

(same); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 (E.D. Mich. 2003) (A small

number of objections received can be viewed as indicative of the adequacy of the settlement);

*Lazy Oil Co. v. Witco Corp.* 95 F. Supp. 2d 290, 332 (W.D. Pa. 1997) ("'[i]n the class settlement

context, silence can be construed as assent'"); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1152

(8th Cir. 1999) (approving settlement where objectors represented fewer than 4% of the class);

*Taifa v. Bayh*, 846 F. Supp. 723, 728 (N.D. Ind. 1994) (class settlement approved despite

objections from more than 10% of the class).[13]

---

[13]  *Parker v. Anderson*, 667 F.2d 1204 (5th Cir. 1982) (affirming approval of settlement over objections of all but one of the eleven named plaintiffs); *Accord TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456 (2d Cir. 1982) (approving settlement despite objections of approximately 56% of the class); *EEOC v. Hiram Waalker & Sons, Inc.*, 768 F.2d 884 (7th Cir. 1985) (settlement approved where 15% of the class objected); *In re Holocaust Victim Assets Litig.*, 2000 U.S. Dist. LEXIS 20817, at *7-8 (E.D.N.Y. 2000) (attached hereto as Exhibit 9) ("the overwhelming majority of the Settlement Class members – more than 99 percent – did not submit any comment regarding the Proposed Plan and presumably had no objection"), *aff'd*, 413 F.3d 183 (2nd Cir. 2001); *Giusti-Bravo v. U.S. Veterans Admin.*, 853 F. Supp. 34 (D. P.R. 1993) (settlement approved although 277 of 708 class members objected).  Indeed, while the number of objectors here is a miniscule portion of the class, courts have recognized that, "[i]n fact, numerous class settlements have been approved over objections from *many* class members," including objections by class representatives themselves.  *Lazy Oil Co.*, 95 F. Supp. 2d at 333 (citing cases); *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803 (3d Cir. 1974) (approval of class settlement even though more than 20% of class objected).

Perhaps even more importantly, of the ten objections that were presented, none provides a compelling reason to reject the settlement. "Once the court has given preliminary approval, an agreement is presumptively reasonable, and an individual who objects has a heavy burden of demonstrating that the settlement is unreasonable." *Whitford v. First Nationwide Bank*, 147 F.R.D. 135, 138-39 (W.D. Ky. 1992). *See also Bronson v. Bd. of Educ.*, 604 F. Supp. 68 (S.D. Ohio 1984); *Stotts v. Memphis Fire Dept.*, 679 F.2d 541 (6th Cir. 1982), rev'd on other grounds 467 U.S. 561 (1984). General objections without factual or legal substantiation carry little weight. 2 NEWBERG (3d) § 11:58; FED. PRAC. & PROC. § 1797.1 ("Only clearly presented objections . . . will be considered."). Here, not a single objector has met its burden of showing that the settlement is unreasonable.

## A.   Certification Of A Rule 23(b)(2) No Opt-Out Class And The Court Approved Notice Were Appropriate.

Not only did the parties stipulate that certification of a class for settlement purposes was appropriate pursuant to Rules 23(a) and Rule 23(b)(2),[14] but the Court preliminarily approved that certification. June 2, 2006 Order at 4. Objectors Lopez and Padilla nonetheless argue that certification of a settlement class under Rule 23(b)(2) is inappropriate, based solely on their erroneous contention that the equitable relief provided by the settlement is "without value." (D. Lopez & A. Padilla Obj. at 4-6). As discussed in Section II.B., below, the settlement provides significant and tangible equitable relief not otherwise available to Class members. Given this, there is no reason to disturb the Court's preliminary certification of a Rule 23(b)(2) settlement class. Thus, members of the class "ha[ve] no absolute right to opt out of the class, even where

---

[14]   Allstate agreed to this certification for settlement purposes only. Allstate reserves its right to challenge class certification should this settlement not proceed.

monetary relief has been sought and is made available." *Penson v. Terminal Transp. Co., Inc.*, 634 F.2d 989, 994 (5th Cir. 1981).

Objectors Devern Wilson, Cynthia Wilson and Maxine Robinson Smith-Silbrey (collectively the "Wilson Objectors") contend that because monetary relief is provided in this settlement, certification under Rule 23(b)(2) is inappropriate, and, instead, certification under Rule 23(b)(3) is required.  (Wilson Obj. at 4.)  However, a class can be certified under Rule 23(b)(2) where monetary relief is awarded so long as that relief is incidental to, and does not predominate over, the non-monetary relief provided to the class. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 413 (5th Cir. 1998); *Pettway v. Am. Cast Iron Pipe Co.*, 494 F.2d 211, 257 (5th Cir. 1975). As demonstrated herein, the non-monetary relief afforded under the Settlement Agreement clearly predominates over the sole element of monetary relief -- demonstrating that the monetary relief that is incidental to the overall settlement benefits awarded to the Class. Accordingly, the Wilson Objectors' contention that the settlement class cannot be certified under Rule 23(b)(2), and instead should be certified under Rule 23(b)(3), is misplaced.

Several objectors also criticize the notice program.  These objectors first contend that the program is inadequate because notice was not mailed to individual class members, but was instead published in newspapers, magazines and other media.  They also argue that the information provided in the notice was insufficient because it does not allow individuals to determine if they are Class members or ascertain the value of the settlement relief.  Both objections lack merit.

*First,* contrary to the contentions of objectors Herrera, Bostio, Pedrero, Spencer and Green, notice by publication was entirely appropriate.  (Herrera and Bostio Obj. at 6; Pedrero and Spencer Obj. at 4; Green Obj. at 4; Lopez and Padilla Obj. at 7; Melder Obj. at 16; Palmares

Obj. at 3.)  Significantly, they overlook the fact that Allstate does not collect or maintain

information identifying the race, ethnicity or nationality of its current or former policyholders

and Allstate does not otherwise know the race, ethnicity or nationality of its current or former

policyholders.  (Sparks Decl. ¶ 8.)  Given that the class is comprised of African American,

Hispanic and Latino current and former policyholders, Allstate cannot identify the Class

members from its records.  Thus, targeting notice by mail to individual Class members was not

possible (let alone required).[15]

      While sending notice by mail is preferred when all or most of the class members can be

identified, where, as here, class members cannot be identified, the authorities hold that notice by

publication is sufficient.  *Pigford v. Veneman*, 355 F. Supp. 2d 148, 162 (D.D.C. 2005) (citing

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974)); *Reppert v. Marvin Lumber & Cedar

Co., Inc.*, 359 F.3d 53, 57 (1st Cir. 2004) (finding that newspaper notices met the requirements of

due process); *Aspinall v. Phillip Morris, Cos., Inc.*, No. 98-6002-H, 2005 WL 3629357, at *2

(Mass. Super. Dec. 7, 2005) (attached hereto as Exhibit 10) (citing *Mullane v. Cent. Hanover

Bank & Trust*, 339 U.S. 306, 315 (1950) (If there is no reasonably practicable way to provide

individual notice, notice by publication will suffice); *Thomas v. NCO Fin. Sys., Inc.*, No. CIV. A.

00-CV-05118, 2004 WL 727071, at ** 3-4 (E.D. Pa. Mar. 31, 2004) (attached hereto as Exhibit

11) (upholding notice by publication because members of the putative class could not be

determined by reasonable means) (citing *Carlough v. Amchem Prods., Inc.*, 158 F.R.D. 314, 325

---

[15]  Objectors Herrera and Bostio also argue that the notice should be mailed to all of Allstate's current
policyholders, regardless of whether they may be Class members.  (Herrera and Bostio Obj. at 6-7.)  Allstate
has millions of current policyholders and it is likely that the majority of these policyholders are not Class
members.  In addition, such an overly broad notice program would result in massive customer confusion and
disruption.  Moreover, the objectors provide no reason that notice to non-Class members should be required.
And this type of notice will not reach former customers.

(E.D. Pa. 1993)).  Moreover, the Fifth Circuit has held that "the type of notice to which a member of a class is entitled depends upon the information available to the parties about that person." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1098 (5th Cir. 1977).  *See also Fontana v. Elrod*, 826 F.2d 729, 732 (7th Cir. 1987) ("While the notice must be adequate, it is not necessary that each member of the class actually receive the notice.").

What is more, the publication notice program in this case was developed and implemented by a nationally recognized expert in class action notice programs. (Finegan Decl. ¶¶ 5, 12.)  This program was robust and specifically structured to reach the African American, Hispanic and Latino class members. (*Id.* ¶ 12.)  It was based on a scientific methodology that is used throughout the advertising industry and that has been embraced routinely by the courts. (*Id.*)  Specifically, in order to reach the identified targets directly and efficiently, the notice program utilized a multi-layered approach that included national magazines, magazines specifically appropriate to the targeted audiences, and newspapers in both English and Spanish (*Id.* ¶ 19.)[16]  The notice appeared in twenty leading national publications including Parade, USA Weekend, Time, People and O, The Oprah Magazine as well as leading minority-targeted publications such as People en Espanol, Vista, Latina, Black Enterprise, Ebony, Essence, Jet, The Vibe and Source. (Settlement Agreement, Ex. 13; Finegan Decl. ¶¶20-23.).  The notice was also published in the largest Spanish language newspapers in the top twelve Hispanic markets,

---

[16] Courts have rejected the type of over-inclusive notice program advocated by Herrera and Bostio.  *See, Carlough v. Amchem Prods., Inc.*, 158 F.R.D. at 327 ( "Far fewer of those persons whose names would be indeed members of the class.  And, there would be no easy method of knowing which persons on these lists were likely to be exposed to asbestos and which persons were not." ); *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 169 (2nd Cir. 1987) (rejecting argument that individual mail notice should have been provided to all 2.4 million Vietnam Veterans, because "far fewer than that number were exposed to Agent Orange" and thus notice would have been "considerably overbroad"); *In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 534, 539-46 (N.D. Ga. 1992) (sending notice to larger group "would most likely confuse the recipients and encourage claims by non-class members" ).

including La Prensita in San Antonio, La Opinion in Los Angeles and El Diario La Presensa in

New York City.  (Settlement Agreement, Ex. 13; Finegan Aff. ¶21..)

     ***Second,*** the detailed notice approved by the Court provided more than sufficient

information to allow individuals to determine whether or not they are Class members and to

evaluate the benefits of settlement.  A class settlement notice need only properly identify the

plaintiff class and generally describe the terms of the settlement so as to alert members "with

adverse viewpoints to investigate and to come forward and be heard." *In re Cement & Concrete*

*Antitrust Litig.*, 817 F.2d 1435, 1440 (9th Cir. 1987.  S*ee also In re S.  Fla. Waste Disposal*

*Antitrust Litig.*, 896 F.2d 493, 495 (11th Cir.1990) (per curiam);  *Burns v. Elrod,* 757 F.2d 151,

154-55 (7th Cir. 1985).  The notice is "not required to provide a complete source of settlement

information."  *In re Gypsum Antitrust Cases,* 565 F.2d 1123, 1125 n.1 (9th Cir.1977).  *See also*

*Weinberger v. Kendrick*, 698 F.2d 61, 70-71 (2d Cir. 1982 (noting that notice "can practicably

contain only a limited amount of information," and it may properly be limited to "very general

descriptions of the proposed settlement.'"); *Greenspun v. Bogan,* 492 F.2d 375, 382 (1st

Cir.1974).  As an initial matter, the description of who is a Class member is clear: (1) the

individual must be a current or former African American or Hispanic or Latino policyholder; and

(2) the policyholder's Allstate policy must have been adversely impacted by credit information.

When credit information has an adverse effect on an Allstate policy, Allstate sends the

policyholder a notice of adverse action pursuant to the Fair Credit Reporting Act.[17] African

American, Hispanic and Latino policyholders that fall within the class are able to self-identify

---

[17]   Objectors' contention that certain notices Allstate sent under the Fair Credit Reporting Act were inadequate because of a separate class action lawsuit is inaccurate.  Allstate sent a notice in connection with policies that it issued where credit allegedly had an adverse effect on the policy.

themselves based on the adverse action notice that they received relating to effect of their credit information on their Allstate policy.

The objections regarding the content of the Court-approved notice are likewise without merit. Rule 23(e) prescribes the content of notices issued in the context of class action settlements. The notice must inform class members of the nature of the pending litigation; of the settlement's general terms; that complete information is available from court files; and that any Class member may appear and be heard a the Fairness hearing. *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 177 F.R.D. 216, 230 (D.N.J. 1997). The legal notice issued in this case not only met, but exceeded these requirements.[18]

Specifically, the notice plainly details each specific element of settlement relief. (*See* Exhibits 1A and 1B to Settlement Agreement.) Further, it makes clear that the notice "only summarizes the proposed settlement" and it directs Class members to the class action administrator to obtain a copy of the Settlement Agreement for complete details about the settlement. (*Id.*) Class members are further instructed that they can obtain the Settlement Agreement from the settlement administrator by phone, mail or through the settlement website. (*Id.*)[19] *See In re Cement & Concrete Antitrust Litig.*, 817 F.2d at 1440 ("Notice is satisfactory if

---

[18] Notably, Rule 23(e) does not require that the legal notice contain a precise valuation of the settlement relief. *See also DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1178 (8th Cir.1995) (Because the purpose of settlement is to avoid the delay and expense of a trial, the Court "need not resolve all of the underlying disputes . . . and the value of the settlement need not be determined with absolute precision."); *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 302 (E.D.Pa. 2003)  (an exact figure is not required by court to evaluate and approve settlement's non-monetary benefits); and *Fickinger v. C.I. Planning Corp*, 646 F.Supp. 622, 630 (E.D.Pa.1986) (To attempt to establish as a matter of legal certainty the value of a claim would defeat the purpose of disposing of a case by settlement rather than trial.); and *Weinberger*, 698 F.2d at 70 n.11 ("any estimate as to class losses - much less individual losses - would have been highly speculative and more likely to hinder informed decision-making by class members than advance it" ).

[19] A review of the various objections filed suggests that all of the objectors in fact obtained copies of the Settlement Agreement.

it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard'") (citation omitted); *Weinberger*, 698 F.2d at 70-71 ("Those who wanted to probe more deeply could, as the notice plainly told them, examine 'the settlement stipulation and the papers and documents filed in this action'"). The notice is consistent with the illustrative notices promulgated by the Federal Judicial Center at the request of the Subcommittee on Class Actions of the U.S. judicial branch's Advisory Committee on the Federal Rules of Civil Procedure. (http://www.fjc.gov.) Finally, it is well established that a district court has great discretion in determining the kind of notice to employ in alerting class members to a proposed settlement and settlement hearing, subject to "the broad reasonableness standards imposed by due process." *Fowler v. Birmingham News Co.*, 608 F.2d 1055, 1059 (5th Cir. 1979); *see also Burns*, 757 F.2d at 154; *Mendoza*, 623 F.2d at 1350-51.

**B.      The Settlement Provides Significant Equitable Relief Not Otherwise Available To Class Members.**

### 1.      The Settlement Algorithm Was The Product Of Settlement Negotiations And Does Not Constitute "Illusory Relief."

The Lopez and Padilla objection contends that the Settlement Algorithm constitutes "illusory" relief because Allstate developed and implemented it as part of its ordinary business practices and not as a result of this settlement. (D. Lopez & A. Padilla Obj. at 4-5.) The objectors misapprehend both the nature of the settlement and the development and implementation of the Settlement Algorithm. In 2000, Allstate introduced an insurance scoring model, also referred to as an insurance scoring algorithm, as one of many rating variables used to price automobile and homeowners insurance policies. (Declaration Number 2 of William R. Sparks, ¶ 2; attached hereto as Exhibit 12). This insurance scoring model was a proprietary model that Allstate developed using internal data and information from credit reports. (*Id.*) Public disclosure of Allstate's insurance scoring model would have resulted in an unfair

26

economic advantage to Allstate's competitors.[20] (*Id.*).  The insurance scoring model was designed to predict the likelihood of insurance losses. (*Id.* at ¶ 3.)  It utilized approximately 30 variables from more than 300 credit report variables compiled and maintained by the consumer reporting agency TransUnion.  (*Id.*)

After developing its insurance scoring model in 2000, Allstate continued to evaluate the predictive power of credit report information (as well as other rating variables) to determine whether modified and/or different uses of credit report information could increase the power of an insurance scoring model to predict insurance losses. (*Id.* at ¶ 4.)  In or about the 3rd Quarter of 2004, the DeHoyos Plaintiffs and Allstate initiated settlement negotiations. (*Id.* at ¶ 5.)  One component of a settlement proposal presented by the DeHoyos Plaintiffs was to develop a new insurance scoring model. (*Id.*)  Plaintiffs contended that a new insurance scoring model could be developed that allegedly had less discriminatory effect on minority policyholders than Allstate's existing insurance scoring model.  (*Id.*)

In conjunction with Plaintiffs' settlement proposal regarding changes to the existing insurance scoring model, and Allstate's ongoing evaluation of credit information to increase its ability to predict insurance losses, Allstate developed a new insurance scoring model. (*Id.* at ¶ 6.)  Allstate developed the new insurance scoring model excluding and/or modifying certain credit report variables that the DeHoyos Plaintiffs had specifically identified. (*Id.*)  The parties agreed on the new insurance scoring model in the 4th Quarter of 2004.  Based on that agreement, Allstate began to make this new insurance scoring model available to its customers, including

---

[20]   Where state law required a public disclosure of insurance scoring models, Allstate developed a non-proprietary version of its insurance scoring model to file in those states.  Therefore, objectors Green, Pedrero and Spencer's argument that Allstate has already publicly disclosed the insurance scoring model that plaintiffs challenged in this case is not correct.  Until this settlement, Allstate had not publicly disclosed its proprietary scoring model.

Class members on a state-by-state and line-by-line basis, as reflected in the Settlement

Agreement.  Therefore, contrary to objector's contentions, the Settlement Algorithm was a

product of this settlement.[21]  It was simply implemented and made available to certain Allstate

policyholders before the parties executed the settlement agreement.[22]

### 2. The Credit Education Program Provides A Tangible Benefit To The Class.

Objector Garcia asserts that the credit education program is "an attempt to offer a service

that is already free and readily obtainable to class members."  (Garcia Obj. at 11-12.)  Objectors

Green, Pedrero and Spencer contend that credit educational material is already generally

available.  (Pedrero Obj. at 6, 12.)  Not so, the credit education program offered through this

settlement is a comprehensive nationwide program specifically targeted to Class members.  It is

not currently available, but it will be funded by Allstate, and developed and implemented by two

leading minority advocacy groups.

Specifically, the credit education program will be developed and implemented by

National Council of La Raza ("NCLR"), the largest Hispanic civil rights and advocacy

organization, and the National Urban League, the nation's oldest and largest community based

African American advocacy organization.  Both NCLR and National Urban League will develop

comprehensive educational programs specifically tailored to their respective constituencies.  By

---

[21] Furthermore, Allstate agreed to use this Settlement Algorithm, without material modification, for two years from its roll-out date.  (Settlement Agreement, ¶3.A.2.). This commitment further negates the unsupportable contention that the Settlement Algorithm constitutes "illusory" relief.

[22] Earlier implementation can only have benefited Class members, some of whom were provided with the opportunity to obtain an insurance policy priced using the settlement insurance scoring model earlier than they would have if Allstate had waited until this settlement agreement became effective.  (The Settlement Agreement does not become effective until the day after an order by the Court granting final approval cannot be appealed, or upon final resolution of any appeals to the Court's final approval order. Settlement Agreement, ¶2.F.)

way of example, the NCLR program will involve formative research, using science-based

approaches to shape community mobilization and social marketing efforts aimed at promoting

consumer behavior change.  NCLR also will identify the opportunities and challenges that

Hispanic and Latino consumers face in credit markets.

NCLR will then oversee and manage the dissemination of this brochure, distributing

English and Spanish language versions to Hispanic consumers that undergo financial or housing

counseling or education through NCLR network.  The brochure will also be available on

NCLR's website, which receives approximately 1.5 million visitors each month and distributed

at the LatinExpo during the NCLR Annual Conference, and which is visited by approximately

20,000 individuals.  http://www.nclr.org/section/events/conference/past_conference_highlights/

conference_photos/.  Finally, the brochure will be posted to NCLR's *Lideres* website.  The

Urban League has a similar program under development.

### 3.    Allstate Has Agreed To Implement A Valuable Nationwide Appeals Process.

Objector Garcia complains that the appeals process is a "vague and virtually worthless

concession" because a customer can only appeal if they had an "exceptional circumstance" and

because that term is not defined.  (Garcia Obj. at 12.)  Garcia offers no explanation why an

appeals program, made available to current policyholders who have experienced an exceptional

circumstance that negatively impacts their credit history, is somehow "vague" or "worthless."

The opportunity for a customer to receive a premium discount based on a successful

appeal is, without question, of value to that customer.  Moreover,  the appeals form specifically

defines the exceptional circumstances as: (1) divorce; (2) death of spouse or member of the same

household; (3) involuntary unemployment; (4) catastrophic medical expense; (5) care of an adult

dependent; (6) identity theft; (7) long term injury, illness or disability; (8) domestic violence; and

(9) additional state specific events as required by law.  (Settlement Agreement, Ex. 11.)  There is nothing vague about what constitutes an exceptional circumstance.  In addition, Allstate has agreed to provide a toll-free telephone number dedicated to assisting customers in this appeals process. (Settlement Agreement, ¶3.D.3.)

Garcia further asserts that the appeals process is "vague" because it does not "give an acceptance rate or a range of possible dollar amount reductions."  (Garcia Obj. at 12.)  By its nature, the appeals process is not susceptible to "acceptance rate" predictions.  Whether customers have experienced an extraordinary circumstance is unique to each customer and not capable of prediction.  Furthermore, even if a customer experiences an exceptional circumstance, whether the exceptional circumstance negatively impacts the customer's credit history information is an individualized inquiry from which an "acceptance rate" for all eligible customers cannot be extrapolated or predicated.  What can be said with certainty, however, is that the appeals process provides a guaranteed right of appeal and safety valve to those negatively impacted by the exceptional circumstance—benefits that are not available absent this settlement.

The exact amount of premium reductions to be received by successful participants in the appeals process is likewise not amenable to calculation.  Indeed, it will depend on the specific rating rules in effect for the state, line and issuing company that issued the policy to that customer.  However, each customer with a successful appeal will receive a specifically quantifiable premium reduction, calculated pursuant to the terms of Allstate's applicable rating rules on file with the state departments of insurance of each applicable state.

Objectors Green, Pedrero and Spencer's assertion that the appeals process has no value because certain states already have laws requiring an appeals process is likewise without merit.

(Pedrero Obj. at 12-13.)  At the time the parties negotiated the appeals process only ten states had enacted a statute or regulation requiring a substantially more limited appeals process.[23] There is plainly value in a nationwide appeals process for those Class members who reside in states that do not currently have such a process.  Equally important, the proposed Allstate appeals process is far more comprehensive then any of the state mandated appeals processes.[24]

### 4. Allstate's Agreement To Commit Substantial Sums To Minority Marketing Benefits The Class.

Objectors Green, Pedrero and Spencer contend that Allstate's commitment to significantly increase and maintain its marketing directed toward minority consumers does not constitute fair consideration because it will only result in Allstate making "more money off the class."  (Pedrero Obj. at 12-13.)  This is mistaken. Plaintiffs alleged that Allstate's use of credit report information to price insurance policies was done to discourage the sale of its insurance policies to minority customers (Compl. ¶15.) While Allstate vigorously rejects this contention, agreeing to significantly increase and maintain marketing directed toward minority customers

---

[23] *See* Amended Reg. 5-1-16 promulgated under Colo. Rev. Stat. § 10-1-109 (2002); Delaware Reg. 906 (2003); S.B. 40-A, 2003 Spec. Sess. (Fla. 2003); S.B. 14, 78th Leg., Reg. Sess (Tex. 2003); S.B. 1284, 2003 Gen. Assem., Reg. Sess. (Va. 2003); S.B. 13, 23d Leg., Reg. Sess. (2003); H.B. 1448, 2003 Leg., Reg. Sess. (La. 2003); H.B. 2071, 2003/2004 Sess. (Kan. 2003); S.B. 560, 46th Leg., Reg. Sess. (N.M. 2005); S.B. 311, 2005 Leg., Reg. Sess. (Mont. 2005); Bulletin No. 04-05 Issued by Dept. of Business and Insurance (N.J. 2004).

[24] In the 10 states that mandate appeals, most require a very limited appeals process.  For example, Florida allows policyholders to appeal rates where their credit information has been adversely affected by the dissolution of marriage or by the credit information of a former spouse. S.B. 40-A ¶ 4(e), 2003 Spec. Sess. (Fla. 2003). Colorado's appeals process is similarly limited. Amended Reg. 5-1-16 promulgated under Colo. Rev. Stat. § 10-1-109 (allowing appeal where credit information has been adversely affected by factors, such as dissolution of marriage, that insurer is prohibited from considering).  The other states add additional grounds for appeal, but no state law requires all of the grounds for appeal available through the appeals program agreed to in this settlement.  (Furthermore, most of these state laws do not require insurers to notify their policyholders who are eligible of the right to appeal. (See e.g., S.B. 40-A ¶ 4(e), 2003 Spec. Sess. (Fla. 2003) (requiring insurer to provide an appeal at the request of applicant but not requiring that insurer notify applicant of right to appeal.) In contrast, Allstate will send letters to all policyholders eligible to appeal describing and facilitating the appeals process.  (Settlement Agreement, Ex. 11.)  In addition, Allstate will provide a toll-free telephone number dedicated to assisting customers in this appeals process.  (Settlement Agreement, ¶3.D.3.)

squarely addresses Plaintiffs' allegation.  Importantly, this was a concession hard fought for by

Plaintiffs' Counsel.  In addition, it ignores that any minority customer who chooses to buy a

policy as a result of such marketing efforts will stand to benefit directly from the other settlement

terms.

**C.      The Monetary Payments Are Reasonable And Provide Value To The Class.**

Objector Garcia argues that the settlement is unfair because it does not take into

consideration that policyholders who maintained insurance policies for longer periods of time

were damaged for a longer period of time than other class members.  (Garcia Obj. at 7.)  Garcia

proposes that the settlement should offer larger payouts for Class members who were customers

for longer periods of time.

Settlement, by its very nature, involves compromise by both sides on the relief afforded

to the class, after hard-fought negotiations over hotly contested issues of fact and law.

"'[I]nherent in a compromise is a yielding of absolutes and an abandoning of highest hopes.'"

*Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1997) (quoting *Milstein v. Werner*, 57 F.R.D.

515, 524-25 (S.D.N.Y. 1972)).  "The fact that a proposed settlement may only amount to a

fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is

grossly inadequate and should be disapproved."  *City of Detroit v. Grinnell Corp.*, 495 F.2d 448,

455 (2d Cir. 1974), abrogated on other grounds by *Goldberger v. Integrated Res., Inc.*, 209 F.3d

43 2d Cir. 2000).  Simply put, a settlement is not, as Garcia apparently believes, "a wish-list of

class members that the Defendants must fulfill."  *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 169

(S.D. Ohio 1992).

First, the monetary payments available to eligible Class members are significant and, on

their face, refute Garcia's demand for larger payouts. Class members can recover between $50

and $150 per qualifying policy.  (Settlement Agreement, Ex. 10.)  Second, the potential

32

monetary payments available to Class members *will* differ depending on whether a Class

member was insured for one policy period or more than one policy period, with greater payments

awarded to qualifying policyholders insured for more than one policy period.  The fact that a

Class member insured for more than three policy periods might be able to litigate his or her

claim and if he or she prevailed, establish greater damages than a Class member insured for

fewer policy periods does not render unreasonable the monetary relief afforded under the

settlement agreement.

**D.     The Preliminary Injunction In The Settlement Agreement Does Not Violate The Anti-Injunction Act.**

In granting preliminary approval of the settlement, this Court appropriately found that the

issuance of a preliminary injunction was necessary and appropriate.  June 2, 2006 Order at ¶ 20.

Contrary to the position advanced by objectors Green, Pedrero and Spencer, the injunction

language in the settlement agreement falls squarely within the jurisdiction exception of the Anti-

Injunction Act and is therefore valid.[25]  (Pedrero Obj. at 19-20.)

Under the jurisdiction exception, a federal district court may grant an injunction to stay

proceedings in a state court where necessary in aid of the court's jurisdiction.  28 U.S.C.A. §

2283.  The term "necessary in aid of its jurisdiction" means that "federal injunctive relief may be

necessary to prevent a state court from so interfering with a federal court's consideration or

disposition of a case as to seriously impair the federal court's flexibility and authority to decide

that case."  *Atlantic Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 295 (1970).

---

[25]  The Anti-Injunction Act is generally recognized to permit a district court to enjoin state court proceedings on three bases: (1) expressly authorized by a federal statute, (2) necessary to assert jurisdiction, or (3) necessary to protect or effectuate a prior judgment by a federal court. *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147 (1988).

District courts are allowed to issue injunctions under the jurisdictional exception where settlement is imminent or pending. *Carlough v. Amchem Prods., Inc.*, 10 F.3d 189, 203-04 (3d Cir. 1993) (a district court's preliminary injunction enjoining absent members of the purported federal plaintiff class in an asbestos-related tort action from prosecuting state claims was necessary in aid of its jurisdiction, since the prospect of settlement was imminent after years of pre-trial negotiations in the complex and far-reaching matter); *Battle v. Liberty Nat'l Life Ins. Co.*, 660 F. Supp. 1449 (N.D.Ala. 1987), aff'd, 877 F.2d 877 (11th Cir. 1989) (class members were permanently enjoined from prosecuting a state court action where the state action would directly interfere with the district court's ability to supervise and dispose of a federal action involving multiple parties and complex antitrust issues, and would remove the court's flexibility in reaching a just solution, protecting the settling defendants, and avoiding conflicting results).

Here, the Court expressly found that the issuance of the preliminary injunction was necessary and appropriate in aid of the Court's jurisdiction over the action and to protect and effectuate the Court's review of the settlement. June 2, 2006 Order at ¶ 20.

**E.     The Release Is Not Impermissibly Overbroad.**

Despite the claims made by various objectors, the general release agreed upon by the parties is not impermissibly overbroad. The Fifth Circuit has noted that "[t]he weight of authority establishes that . . . a court may release not only those claims alleged in the complaint and before the court, but also claims which 'could have been alleged by reason of or in connection with any matter or fact set forth or referred to in' the complaint." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) (quoting *Patterson v. Stovall*, 528 F.2d 108, 110 n. 2 (7th Cir.1976)). "'[T]he very nature of a general release is that the parties desire to settle all matters forever'" and "'[a] general release . . . not only settles enumerated specific differences, but claims 'of every kind or character, known and unknown.'" *Zandford v.*

34

*Prudential-Bache Sec., Inc.*, 112 F.3d 723, 727 (4th Cir. 1997) (quoting *Virginia Impression*

*Prods. Co., Inc. v. SCM Corp.*, 448 F.2d 262, 265 (4th Cir. 1971)). *See also Wal-Mart Stores*

*Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 106 (2d Cir. 2005) ("Broad class action settlements are

common, since defendants and their cohorts would otherwise face nearly limitless liability from

related lawsuits in jurisdictions throughout the country."). Where, as here, "a release provides

that 'any and all claims,' 'past, present, or future' are to be extinguished, a court is required to

enforce its provisions both as to known and unknown claims, "because [a] contrary result would

not contribute significantly to the public policy of encouraging the settlement of differences and

compromise of disputes in which the execution and exchange of releases is the common and

legally accepted means of consummation." *Ingram Corp. v. J. Ray McDermott & Co., Inc.*, 698

F.2d 1295, 1312 (5th Cir. 1983). *See also  Wal-Mart Stores Inc.*, 396 F.3d at 106 ("Practically

speaking, '[c]lass action settlements simply will not occur if the parties cannot set definitive

limits on defendants' liability.'" (quoting *Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 254 (2d

Cir.2001)); *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366-67 (3d

Cir.2001) (finding that refusing to grant a broad settlement release would undermine multi-

district class settlements because defendants would be concerned that their exposure to liability

would be too great).  Here, the release also specifically provides that "nothing herein is intended

to or shall be construed as a release of any [c]laims arising after the Effective Date."

1.   **The *Melder* Louisiana State Law Claims Lack Merit And The *Melder*
     Claims Can Appropriately Be Released.**

The *Melder* objectors claim that the settlement is unfair because the relief is insufficient

to address their Louisiana state law claims. (Melder Obj. at 13.) *Melder* is a putative class

action filed by nine African American named plaintiffs who seek to certify a class of Louisiana

residents only.  (*Id.* at 4.)  The *Melder* objectors argue that their claims against Allstate are

identical to those raised in *DeHoyos,* with the exception that *Melder* also seeks damages under certain Louisiana laws. (*Id.*)

Melder challenges the legality of the rates that Allstate charges for automobile and homeowners insurance and that are approved by the Louisiana Insurance Rating Commission (the "LIRC"), based on Allstate's use of credit information. As the Fifth Circuit held, because these rates are approved by the LIRC, the *Melder* Plaintiffs were required to exhaust administrative remedies in Louisiana before filing suit. *Melder v. Allstate,* 404 F.3d 328, 332 (5th Cir. Mar. 16, 2005). Thus, following the Fifth Circuit's remand of *Melder* to the Eastern District of Louisiana, *Melder* appealed Allstate's rates to the LIRC, directly challenging the legality of these rates under Louisiana law. The LIRC held a hearing, took evidence from *Melder* and ultimately found that the Allstate rates challenged in *Melder* are in full compliance with Louisiana law. Transcript of Testimony at 249, Marilyn Melder v. LIRC, Docket No. L-05-04 LIRC (Aug. 17, 2005) (attached hereto as Exhibit 13).[26] Accordingly, the LIRC decision flatly repudiates the Melder objectors' contention that their Louisiana state law claims are worth between $1.5 billion and $3.5 billion. In fact, the LIRC has affirmatively placed no value on the *Melder* Louisiana state law claims.

Furthermore, the $1.5 billion to $3.5 billion valuation that the Melder objectors ascribe to their state law claims is based on their contention that they are entitled to a $10,000 statutory penalty. (Melder Obj. at 9.) This $10,000 penalty is found in LA. REV. STAT. ANN. § 22:652.4 (2003). First, this statute in inapplicable to *Melder's* claims. The statue prohibits insurers from

---

[26] The Melder objectors' contention that the LIRC dismissed its claims challenging Allstate's rates on "jurisdictional" grounds is incorrect. The LIRC declined to address certain claims that the Melder objectors asserted against State Farm, not Allstate. Transcript of Testimony at 139-40, 249-50, Marilyn Melder v. LIRC, Docket No. L-05-04 LIRC (Aug. 17, 2005). (State Farm is also a defendant in the Melder action, and these claims against State Farm did not relate to State Farm's insurance rates in any event.)

refusing to issue or failing to renew insurance "solely because of the race or the applicant or the economic conditions of the area in which the property sought to be insured is located, unless such refusal to issue or failure to renew is based on sound actuarial principles or is related to actual experience." *Id.* at §22:624.4(A). There is a private right of action under this statute against insurers, but private litigants can only recover "actual damages suffered by the injured party and reasonable attorney's fees." *Id.* at §22:624.4(D). The $10,000 penalty can only be assessed by the Insurance Commissioner. *Id.* at §22:624.4 (C) and (D).[27] In addition, as the credit reports from which Allstate derives insurance scores do not contain any information identifying race or ethnicity, the Melder objectors cannot make out a prima facie case under this statute which requires that the refusal to issue or renew be based "solely on the race" of the customer.

Putting aside the LIRC's repudiation of *Melder's* Louisiana state law claims, the *Melder* Plaintiffs cannot make out a *prima facie* case under state law. For example, *Melder's* claim under Article I, Section 12 of the Louisiana Constitution is unsupportable because the provision applies only to discrimination in access to public areas, accommodations or facilities -- none of which are at issue in this case. LA. CONST. art. 1, § 12. *Melder's* human rights claims under LSA-R.S. 51:2232, 2247, 2255, et. seq. are equally unavailing because these laws are limited to discriminatory practices in connection with public accommodations. LA. REV. STAT. ANN. §§ 51:2232, 51:2247 (2006). Lastly, *Melder's* claims under Louisiana Unfair Trade Practices Act, La. R.S. 22:1214, *et seq.*, fail because the Unfair Trade Practices Act does not grant a private cause of action. *See Riley v. Transamerica Ins.* Group, 923 F.Supp. 882, 888 (E.D. La. 1996)

---

[27]   As the LIRC has rejected Melder's claim that Allstate's rates violate Louisiana law, including La. Rev. Stat. §§22:624.4, there should be no basis for a $10,000 penalty in any event.

(dismissing home resident's claim against insurer and adjuster for violation of Louisiana Unfair Trade Practices Act ("LUTPA") for failure to state a cause of action); *Klein v. Amer. Life & Cas. Co.*, 858 So. 2d 527, 533 (La. Ct. App. 2003);  *Clausen v. Fid. & Deposit Co. Of Maryland*, 660 So. 2d 83, 86 (La. Ct. App. 1995).

**F.     The Remaining Objections Are Likewise Without Merit And Should Not Affect Approval Of The Settlement As Fair, Adequate And Reasonable.**

**1.     The Request Forms Are A Necessary Predicate To Facilitating Certain Settlement Relief.**

Objector Marvel Garcia argues that the request form required to apply for monetary relief is designed to limit the "take rate" by asking former policyholders to identify policy information. (Garcia Obj. at 7-8.)  The provision of policy information in the request form is not required and was not intended to be onerous.  Instead, the purpose of the request form is to help Allstate identity the Class members in its records.  Because many of Allstate's customers share the same or similar names, it is not unusual to find multiple and different policy records associated with a single name.  (Sparks Decl. No. 2, ¶ 2.)  By way of example, Allstate has thirty-three different consumers in its records named Marvel Garcia in its records.  (*Id.*)  As a result, additional information, such as policy information, may be needed to identify specific Class members.

In sum, the likelihood of identifying Class members in Allstate's records increases if Allstate knows the type of insurance (i.e. automobile or homeowners) and improves significantly if a policy number is provided.  (*Id.*)  Therefore, while Allstate may be able to identify a Class member in its records by name, the request form is designed to maximize Class member

identification -- where name alone does not suffice -- by allowing Class members to provide policy information. [28]

Objector Garcia also contends that the request form process is designed to limit monetary payments. (Garcia Obj. at 8.) To the contrary, the request form process is required to confirm class membership and obtain the necessary information from Allstate records in order to: (1) provide the important information to current policyholders about how they will have the opportunity to obtain a policy priced using the settlement algorithm; and (2) determine the amount of the monetary payment, if any, for which a class member may qualify. Without this information, Allstate cannot dispense these settlement benefits, including monetary payments, to eligible Class members. Moreover, the request form requires Class members to authorize Allstate to obtain their credit report information pursuant to federal law. 15 U.S.C.A. §1681b. Therefore, contrary to Garcia's contentions, the request forms are a necessary prerequisite to the payment of any monetary relief and are plainly not an attempt to limit monetary payments.[29]

### 2.   There Are No Intra-Class Conflicts That Would Serve To Disqualify The Class Representatives.

Certain objectors make a vague attempt to disqualify the Class representatives based on alleged due process violations. This objection is invalid on its face, and fails to meet the standard for demonstrating inadequacy of representation. The Supreme Court set forth the

---

[28]   Garcia argues on the one hand that obtaining policy information to properly identify class members and facilitate settlement relief is too arduous and aimed at suppressing class member participation in the settlement. However, Garcia argues on the other hand that allowing class members to simply self-identify as African-American or Hispanic or Latino will allow for fraudulent claims. While Garcia offers no alternative to this self-identification, her positions are diametrically opposed.

[29]   Objectors Herrera and Bostio incorrectly contend that class members have only sixty (60) days to return request forms and this that short period "seems calculated to suppress redemption rates." (Herrera Obj. at 12.) To the contrary, request forms have been available, and class members have been submitting request forms, since July 2006 when the first publication notice was issued. Therefore, class members will have almost six (6) months to return request forms.

standard for determining violation of due process in *Hansberry v. Lee*, holding that "this Court is justified in saying that there has been a failure of due process only in those cases where it cannot be said that the procedure adopted, fairly insures the protection of the interests of absent parties who are to be bound by it." 311 U.S. 32, 42 (1940).  "It is axiomatic that a putative representative cannot adequately protect the class if the representative's interests are antagonistic to or in conflict with the objectives of those being represented . . .  [b]ut only a conflict that goes to the *very subject matter of the litigation* will defeat a party's claim of representative status. 7A Wright & Miller, Federal Practice and Procedure § 1768 (2000) (emphasis added).  "Beyond that straightforward proposition, defining the level of antagonism or conflict that should preclude class certification is a more difficult proposition." *Id.*  Numerous conflicting situations that do not pertain to the class claims directly have been held not to bar a finding of adequate representation.  1 Newberg on Class Actions §3.25.

Here, objector Garcia suggests that the settlement will only benefit current policyholders, thus creating a conflict between current and former policyholders.  (Garcia Obj. at 7.)  This is untrue.  Although the Settlement Algorithm and appeals process guaranteed by the settlement will provide a benefit to current and future policyholders,[30] other aspects of the settlement provide benefits to former policyholders.  For example, Allstate will make monetary payments to Class members who qualify under a formula that compares the insurance score group assigned to them in the past and the insurance score group assigned under the Settlement Algorithm. Qualifying Class members will receive between $50.00 to $150.00 depending on the amount of improvement in their insurance score group and the length of time they held the particular policy.

---

[30]  In this regard, the objectors fail to account for the fact that a former policyholder who decides to apply for a new policy with Allstate will benefit from all aspects of the equitable relief provided.

Former policyholders are equally able to apply for a portion of the monetary distribution.  In addition, Allstate's agreement to fund credit education will benefit all Class members -- whether or not they are current policyholders -- as well as other non-Class members.

### 3.  The Settlement Does Not Intentionally Chill Objections.

The Herrera and Bostio Objectors argue that the settlement was designed to chill potential objectors.  (Herrera Obj. at 12-13.)  This objection lacks merit for these reasons.  *First,* although objectors claim, with no support, that the provision requiring an appeal bond will chill objections, the objectors fail to explain why requirement of a bond is *per se* objectionable.  Nor do they cite a single case to suggest that the appeal bond required in this case is "unnecessarily high."  To the contrary, requiring a bond is a common procedural device to protect the parties' interests.  *See, for example, Hamlin v. Charter Twp. of Flint,* 181 F.R.D. 348, 353 (E.D. Mich. 1998) (Noting that the "bond requirement serves a substantial function in balancing the parties' interests).  *Second,* the objection to the requirement that an objector's attorneys disclose prior involvement in class actions is without merit.  Indeed, although they contend that such a requirement is not fair, adequate or reasonable, they nonetheless state that they have already adhered to the requirement.  On its face, their ability to comply demonstrates that the requirement did not, in fact, chill such objections.  Finally, why is it unfair to provide this Court with full knowledge about the record and experience of objectors' counsel?  Class counsel are required to do so, and anyone presenting an objection that seeks to supplant or interfere with class counsel's representation of this class should be required to do the same.

### 4.  A *cy pres* Award Is Not Appropriate.

Objector Garcia argues that because there are class members that will not receive any direct benefit from the settlement, a *cy pres* distribution is appropriate.  (Garcia Obj. at 13.)  *Cy pres* distributions may be appropriate where there is a settlement fund that is not fully distributed

41

to the class. *See Democratic Cent. Comm. of District of Columbia v. Washington Metro. Area Transit Comm.*, 84 F.3d 451, 455 (D.C. Cir. 1996) ("In class actions, some courts have applied the equitable doctrine of *cy pres* to undistributed damage or settlement funds."); 2 H. Newberg, NEWBERG ON CLASS ACTIONS § 0.15 at 372 (1985) (Noting that the *cy pres* doctrine traditionally applies where a settlement agreement is silent concerning the distribution of unclaimed funds). *See also*, Natalie A. DeJarlais, *The Consumer Trust Fund: A Cy Pres Solution to Undistributed Funds in Consumer Class Actions*, 38 Hastings L.J. 729, 738-39 (1987) (noting that *cy pres* distributions are controversial and that the Second, Fourth and Ninth Circuits have disallowed *cy pres* distributions in class actions). However, here there is no settlement fund. As discussed above, Allstate will make monetary payments to all qualifying class members who timely return request forms. There is no cap on the total amount of monetary payments to the class. Accordingly, there will be no excess funds that could be distributed through a *cy pres* award.

## CONCLUSION

For all of the foregoing reasons, Allstate respectfully requests that the Court reject the objections to the settlement and grant final approval of the settlement reached in this matter.

Dated: December 8, 2006

Respectfully submitted

Kevin Sadler
Baker Botts LLP
98 San Jacinto Blvd., Suite 1500
Austin, Texas  78701
512.322.2500(tel)

42

Tony P. Rosenstein
Baker Botts L.L.P.
One Shell Plaza
910 Louisiana
Houston, Texas 77002
(713) 229-1582 (tel)


Jeffrey Lennard
M. Keith Moskowitz
Sonnenschein Nath & Rosenthal LLP
7800 Sears Tower
Chicago, Illinois 60606
(312) 876-8000 (tel)


Richard C. Godfrey, P.C.
Donna M. Welch
Kirkland & Ellis
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000 (tel)

*Attorneys for The Allstate Corporation,
Allstate Insurance Company, Allstate
Indemnity Company, Allstate Life Insurance
Company and Allstate Texas Lloyds*

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that true and correct copies of Defendants'

Brief In Support Of Proposed Class Settlement was served on December 8, 2006, via first-class

mail, upon all attorneys and class objectors of record.

_____

Kevin Sadler

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

## Notice of Document/Attachment(s)/Pages  Not Imaged

### See Case File to View/Copy
### Document/Attachment(s)

_✓_   Document and/or  attachments exceed 100 pages.

___   Transcript

___   Exhibits or attachments submitted in binders or spiral notebooks

___   **Exhibits to Document not imaged**

___   **Sealed**